```
 1              UNITED STATES DISTRICT COURT OF OHIO
                          WESTERN DIVISION
 2                          -   -   -

 3

 4    ANTONIO MOORE,                 :
                                     :
 5                   Plaintiff,  :
                                     :    CASE NO. C-1-02-0430
 6             vs.               :    (J. Weber)
                                     :
 7    KROGER COMPANY, ET AL.,    :
                                     :
 8                   Defendants.:

 9                          -   -   -

10

11

12             Deposition of POLICE OFFICER MARCUS McNEIL,

13    taken as on behalf of the Plaintiff, upon

14    cross-examination, pursuant to the Federal Rules of

15    Civil Procedure and pursuant to agreement among

16    counsel as to time and place of taking the deposition,

17    at 10:00 a.m., on Wednesday, March 26, 2003, at the

18    offices of Manley-Burke, 225 West Court Street,

19    Cincinnati, Ohio, before Edna M. Hawkins, a court

20    reporter and notary public in and for the State of

21    Ohio.

22                          -   -   -

23

24              HAWKINS COURT REPORTING SERVICES
                      1160 INNER CIRCLE DRIVE
25              CINCINNATI, OHIO  45240-3002
                   TELE/FAX:  513-851-2313
```

1

6

1          Q.    And tell me a little bit about your

2    educational background?

3          A.    I went to Western Hills High School,

4    where I was graduated in 1992.

5          Q.    Have any post high school education

6    classes, courses, anything in that regard?

7          A.    No, I don't.

8          Q.    What about any certificates, trades,

9    anything in that respect?

10          A.    No, I don't.

11          Q.    And how are you currently employed,

12    officer?

13          A.    City of Cincinnati Police Officer.

14          Q.    And how long have you been employed

15    with the City of Cincinnati?

16          A.    Four-and-a-half years.

17          Q.    So your title today is what?

18          A.    Police Officer.

19          Q.    Police Officer.  And briefly describe

20    to me what are your duties as a Police Officer with

21    the Cincinnati Police Department?

22          A.    I patrol the areas of Bond Hill, just

23    routine police patrol.

24          Q.    And that means that you're the driver

25    of a police vehicle and you just drive through the

9

1          A.   At the time, it was 22 weeks; may be
2    24 weeks now.
3          Q.   Is it different now?
4          A.   I think they changed it two weeks,
5    moved it up two weeks.
6          Q.   Okay.  So during those 22 weeks, you
7    would just have various training in the areas
8    concerning, I believe you said, law, physical
9    abilities and just tactical --
10          A.   Correct.
11          Q.   -- type of areas?  Now, did your
12    training also include training on how to effectuate
13    an arrest?
14          A.   Yes.
15          Q.   Did you also -- Well, tell me a little
16    bit about that.  Is that part of some of the field
17    training that you just spoke about?
18          A.   It's field training.  It's classroom
19    training also.
20          Q.   Did you also receive training
21    regarding probable cause?
22          A.   Yes.
23          Q.   And tell me a little bit about that.
24    What does that consist of?
25          A.   Probable cause is reasons that you

10

1    have to arrest a person that leads up to an arrest.

2         Q.   Okay.  Now, the training that you

3    received on that, would that have been also in

4    classroom and in the field?

5         A.   Yes.

6         Q.   Okay.  Now, after becoming a

7    Cincinnati Police Officer, have you received any

8    additional training on how to effectuate an arrest?

9         A.   I've had training for investigative

10   areas.  I've had training in gunshot residue, various

11   trainings as far as just police related.

12        Q.   Okay.  And that's something that's

13   required by the Department?

14        A.   Yes.

15        Q.   Okay.  And how often do you have

16   training?  Is this annually, quarterly or how is that

17   --

18        A.   Right.  It's yearly.

19        Q.   Yearly?

20        A.   Um-hum.

21        Q.   Okay.  So you have yearly training in

22   different areas from year-to-year or is it always the

23   same areas?

24        A.   It's different trainings.

25        Q.   Okay.  And that's just mandated or set

11

```
 1   up by the Department?

 2           A.   Correct.

 3           Q.   Now, what about any post training, and

 4   when I say, "post," I mean since you've been a police

 5   officer, have you had additional training on probably

 6   cause as part of the yearly training that you spoke

 7   about.

 8           A.   I can't remember as far as just that in

 9   detail, but part of our training is we have drug

10   training just to, to recognize drug activity and

11   making the arrest, so --

12           Q.   Okay.  So some of the training

13   probably would have covered, is that what you're

14   saying, would have covered that issue --

15           A.   Correct.

16           Q.   -- in other training you received?

17           Tell me a little bit, Officer McNeil,

18   about training or if you've received any training as

19   it relates to non-moving violations.

20           A.   Non-moving violations?

21           Q.   Correct.  Now, whether you cite it;

22   can you arrest for it; have you covered that part?

23           A.   A non-moving violation --

24           Q.   Yeah, like --

25           A.   -- that would be a parker?
```

12

```
 1              Q.   Exactly.

 2              A.   It's just a citation.

 3              Q.   Okay.  And that's part of the training

 4    that you would have received --

 5              A.   Right.

 6              Q.   -- prior to -- well, I guess, in the

 7    process of becoming a Cincinnati Police Office?

 8              A.   Right.

 9              Q.   Now, tell me a little bit about what

10    that consisted of.

11              A.   A parking violation?

12              Q.   Correct.

13              A.   Parked in any violation of a posted

14    sign; parked with expired tags, parked with no

15    license plates, parked too far from a curb.  I mean,

16    it's a ton of things you can be cited for on parking

17    violations.

18              Q.   Okay, and that's something that you

19    would look for while you're on patrol in the Bond

20    Hill area?

21              A.   Correct.

22              Q.   Okay.  Now, have you received any -- or

23    covered that type if issue in any of your

24    post-training or seminars or whatever you may have

25    taken with the Cincinnati Police Department?
```

13

1          A.    I don't understand that question.

2          Q.    The annual training that you told me

3    that you receive from the Cincinnati Police

4    Department.

5          A.    Do we have training as far as writing

6    parkers?

7          Q.    Right.

8          A.    No.

9          Q.    Okay.  So you wouldn't have had any --

10   Since you've been a police officer, you would not have

11   had any additional training as it relates to writing

12   parkers.  I'll use your words?

13         A.    No.

14         Q.    Okay, officer, now, you mentioned --

15   and I'll just go right into that -- that on the day

16   with the incident involving Mr. Moore, you were doing

17   a detail assignment?

18         A.    Correct.

19         Q.    What exactly is a detail assignment?

20         A.    It's a, it's off-duty work that you do

21   for any establishment that requires a police officer

22   presence.

23         Q.    Okay.  Is it by contract between the

24   establishment and yourself?

25         A.    Correct.

14

```
 1              Q.    A written contract?

 2              A.    Yes.

 3              Q.    So the establishment would come and

 4   just ask Officer McNeil if he would like to do

 5   off-duty work at the establishment?

 6              A.    They wouldn't ask me; I'll sign up for

 7   it and it's -- you're picked, you're hand-picked by

 8   the person in charge of the detail.

 9              Q.    Okay.  You would sign up for it

10   through --

11              A.    Through a district.

12              Q.    Through the district.

13              A.    Through the district.

14              Q.    Just to make sure that I have this

15   because I'm just not familiar with how that actually

16   works, there would be a list posted in the district

17   --

18              A.    Right.

19              Q.    -- correct, and on that list there may

20   be a number of different establishments who are in

21   need of off-duty police officers?

22              A.    Right.

23              Q.    You just sign your name by the

24   establishment and the time that you would be

25   available?
```

15

1        A.    Correct.

2        Q.    Okay.  And who makes the determination

3  of yes, you can do that off-duty detail or no, we're

4  giving it to officer X?

5        A.    Detail Coordination.

6        Q.    Okay.  Is that a unit?

7        A.    Yes.

8        Q.    Okay.  Who is eligible to do details

9  which -- Is there -- specific police officers that are

10  eligible for off-duty assignments or detail work?

11       A.    Any sworn police officer that's on

12  duty or needs -- has police powers.

13       Q.    Okay.  So no special requirements, no

14  certain number of training hours, or nothing to that

15  effect, as long as you're a sworn police officer?

16       A.    Well, you have to be off probation.  I

17  think it's one year.

18       Q.    Okay.  And do you -- have you ever

19  worked as a detail coordinator?

20       A.    No.

21       Q.    Do you know what method the detail

22  coordinators use to approve or disapprove officers

23  for specific detail assignments?

24       A.    I have no idea.

25       Q.    Have you ever signed up for a detail

16

1  that you didn't receive?

2          A.    Yes.

3          Q.    Do you know what the reason for you

4  not receiving that would have been?

5          A.    It may be because she gave me x-amount

6  of details in another area or the person may have more

7  seniority.

8          Q.    Okay.  So it could just be a number of

9  different reasons as to why?

10         A.    Right, right.

11         Q.    Okay.  I'm following you.

12                What about the establishment, do they

13  ever require -- they have specific requirements for

14  the officers that, that they would like to do the

15  detail assignments there?

16         A.    Sometimes.  At this particular

17  establishment, they may be parking in a fire lane; you

18  have to move cars out of the fire lane, up against the

19  curb of the store; may be some aggressive panhandling

20  or just disorderly juveniles running around in the

21  store or whatever may be going on to request a police

22  presence.

23         Q.    Okay, but what I'm asking is do they

24  have any specific requirements for the individual

25  officer, like oh, we want a veteran officer or we

17

```
 1   want a officer who's on a bike or --
 2            A.    Not to my knowledge.
 3            Q.    Okay, but now, I believe what you were
 4   just stating to me is some -- you were just giving me
 5   reasons why an establishment may want an off-duty
 6   officer --
 7            A.    Right.
 8            Q.    -- is that -- Okay, okay; I'm just
 9   wanting to make sure I understand what you're saying.
10            Now, doing detail work, is that
11   strictly voluntary?
12            A.    Yes.
13            Q.    And is there a explanation sheet or
14   some kind of manual or something that you follow to
15   do detail work?
16            A.    No.
17            Q.    So it's just assumed once you're off
18   probation, you want to sign to do detail, it's
19   assumed that you would know exactly what to do once
20   you do that detail assignment; is that correct?
21            A.    Pretty much, yes.  I mean, it's basic
22   police work, just patrolling and, and observing of
23   what's goin' on.
24            Q.    Okay.  Now, when you were doing detail
25   work for the Kroger store, what were your duties
```

18

1    there, just the basic police patrol work?

2            A.    Yes.

3            Q.    And prior to the incident where you

4    were involved with Mr. Moore, had you done previous

5    details at Kroger's locations?

6            A.    Yes.

7            Q.    Had you done previous details at that

8    specific Kroger location?

9            A.    Yes.

10           Q.    What other locations had you been at,

11   if you remember?

12           A.    Far as Krogers?

13           Q.    Yes.

14           A.    That was the only one.

15           Q.    And prior to the incident involving

16   Mr. Moore, how many details would you say, roughly,

17   that you had done at that Kroger's location?

18           A.    I can't remember.

19           Q.    More than five?

20           A.    Yes.

21           Q.    More than 10?

22           A.    Yes.

23           Q.    More than 15?

24           A.    Probably.

25           Q.    So what about 20, more than 20?

```
 1              A.    Between five and 10, maybe.
 2              Q.    Okay, okay.  Now, would that -- What
 3  period of time would that have been prior to the
 4  incident with Mr. Moore, like, within that -- If this
 5  happened in June, this incident occurred in June,
 6  would that have been within that year?  Had it been,
 7  like, two years?
 8              A.    Within that year.
 9              Q.    Okay.  At various different times or
10  are your detail assignments always at the same time
11  for the Kroger store?
12              A.    At that time, I think I was doin' the
13  4:00 to 8:00 shift.
14              Q.    Okay.  And what about the other
15  details, the 15 or 10, 15 that you've had previously?
16              A.    It was always 4:00 to 8:00.
17              Q.    Okay, always 4:00 to 8:00, 4:00 p.m. to
18  8:00 p.m.?
19              A.    Yes.
20              Q.    Now, while you were doing details at
21  that Kroger store, had you ever received any
22  customer's complaint about you or your conduct?
23              A.    No.
24              Q.    What about any complaints from
25  employees of Kroger's about or your conduct?
```

22

1   work hours, while they're working.  Would something

2   like that apply to you, as well?

3         A.   No.

4         Q.   Okay.  Were you told anything about

5   rules and regulations or anything like that that you

6   needed to follow while you were doing detail work for

7   the Kroger Company?

8         A.   No, just, just have a presence while

9   you're there, basically.

10        Q.   Okay.  Now, while you're doing detail

11   work -- I know you said you would be paid by the

12   establishment -- do they cover any other benefits for

13   you at that time?

14         A.   No.

15        Q.   Okay.  So if you were to get injured

16   while doing detail work and were eligible to receive

17   Workmen's Compensation, that would come through the

18   Department or the establishment?

19         A.   I have no idea.

20        Q.   Okay.  Because you've never been

21   injured --

22         A.   Correct.

23        Q.   -- while you're working?  All right.

24   So, then, is the -- as far as benefits that you

25   receive while you're doing detail work, is your

27

```
 1   manual?
 2           A.    Right.
 3           Q.    A manual in Krogers that's written out
 4   by the Cincinnati Police Officers, who are doing
 5   detail work there?
 6           A.    Right.
 7           Q.    But what about a specific Kroger
 8   employee manual?   Have you ever received anything
 9   like that?
10           A.    No.
11           Q.    Were you ever instructed -- Well, what
12   about any, any literature regarding rules and
13   regulations from Krogers?   Have you ever received
14   anything like that from any Kroger representative?
15           A.    No.
16           Q.    Have you ever received any manuals or
17   literature from the Cincinnati Police Department
18   regarding Kroger details?
19           A.    No.   We have just detail, detail
20   regulations overall for whatever detail you're doing.
21           Q.    Okay, and that is issued by the
22   Cincinnati Police Department?
23           A.    Right.
24           Q.    So you've received a copy of that?
25           A.    Right.
```

41

```
 1   uniform?

 2              A.   Yes.

 3              Q.   And if you can just explain, briefly

 4   -- It was a full uniform?

 5              A.   Yes.

 6              Q.   What, exactly, just briefly, is a full

 7   Cincinnati Police Uniform?

 8              A.   Consisting of what I'm wearing today,

 9   the issue duty weapon, night stick, a radio.

10              Q.   Okay.  And so you were dressed in that

11   at the time.  Now, when you came to that store that

12   day, you had been relieving someone, I believe you

13   stated earlier?

14              A.   Right.

15              Q.   Do you remember what the store was

16   like that day?  Was it a crowded day, a light day,

17   very many people when you, initially, arrived?

18              A.   That store is normally busy all the

19   time.

20              Q.   Okay.  And how long after you had

21   arrived at work, do you recall first seeing Mr.

22   Moore?

23              A.   I can't remember.

24              Q.   What were you doing when you first saw

25   Mr. Moore.
```

45

1          A.    Yes.

2          Q.    And there is a bank located inside of

3    this Krogers?

4          A.    Correct.

5          Q.    I believe it's a Fifth-Third Bank; is

6    that correct?

7          A.    Yes, it is.

8          Q.    Okay.  And does he try to continue to

9    walk as you're talking to him about moving the

10   vehicle?

11         A.    No.  He's standing there, engaged in

12   conversation with me.

13         Q.    And what were you saying in response

14   to Mr. Moore or were you just standing there?

15         A.    I responded to him, just telling him

16   he needed to honor the sign and not park there and

17   that there is -- if he wanted to park, there's -- I

18   believe he was in this spot, here (pointing on

19   exhibit), and there's a spot directly behind him that

20   was -- it was a open space.  All he had to do was

21   just back up in it.  He had the same parking spot,

22   maybe, five yards away from where he was at.

23         Q.    Okay.  And once Mr. Moore indicated to

24   you that he wasn't to go to move, did you contact the

25   Kroger manager?

46

```
 1              A.   No, I didn't.
 2              Q.   Okay.  Was there a manager or someone
 3   from the administration from Kroger out there at that
 4   time?
 5              A.   I can't recall.
 6              Q.   Okay.  How many times did you ask Mr.
 7   Moore to move his vehicle?
 8              A.   Several.
 9              Q.   Just repeatedly, move your vehicle,
10   move your vehicle?
11              A.   Um, yes.
12              Q.   Okay.  How long did this conversation
13   between you and Mr. Moore last?
14              A.   It may have lasted, maybe, all of four
15   or five minutes before I called for backup.
16              Q.   Do you remember if it was still
17   daylight out?
18              A.   Yes.
19              Q.   Now, you said some people had began --
20   "patrons," I believe is your word and employees --
21              A.   Some, some customers and some
22   employees.
23              Q.   Okay.  And they started to gather.
24   Were they in the parking lot around you and Mr.
25   Moore?
```

47

```
 1              A.   Not in the parking lot.  They were

 2   more on the apron of the walkway, near the pop

 3   machines.

 4              Q.   Okay.  A large crowd, like, more than

 5   10 people?

 6              A.   More than 10 people; yes.

 7              Q.   And they were just standing, observing

 8   you and Mr. Moore?

 9              A.   Some of 'em started to, to get

10   involved, shouting things.  I can't -- The exacts

11   words was -- some things were screw that, but in a, in

12   a profane, profane way.  "You ain't got to do what he

13   sayin'," just, just normal young teenage activity when

14   somethin's goin' on with the police.

15              Q.   Okay.  Now, were you facing the crowd?

16              A.   No.  My back was to the crowd.

17              Q.   Okay.  So Krogers would have been, the

18   establish --

19              A.   Behind us --

20              Q.   -- would have been behind you?

21              A.   Right.

22              Q.   Now, where you and Mr. Moore were

23   standing in the parking lot, were you blocking

24   traffic from coming through?

25              A.   No.
```

48

1          Q.   Now, Mr. Moore is stopped and he's
2   just talkin' to you; you're trying to ask him to move
3   his vehicle and you said that he started talkin'
4   about a number of different things:  the Justice
5   System, the police and so forth?
6          A.   Um-hum.
7          Q.   Did he ever make any other attempts or
8   efforts to go inside of the Kroger Store?
9          A.   Not that I recall.
10          Q.   Okay.  Did you tell him he could not
11   go inside of the Kroger Store?
12          A.   No, I did not.
13          Q.   Did you, in any way, stop him from
14   going inside the Kroger Store, and when I say, "in
15   any way," I mean by any kind of manual gesture or
16   anything to that effect?
17          A.   No, I did not.
18          Q.   Okay.  Did Mr. Moore indicate to you
19   that -- No.  Strike that.
20               Do you know if the bank was even open
21   at this time, the Fifth-Third Bank, inside the
22   Krogers?
23          A.   I believe the blank -- the bank closes
24   at 8:00, so I get off at 8:00 which, if they're
25   closed, I'm gone, I would say they were open.

50

1    Q.    So the crowd was about 40 feet away?

2    A.    Maybe -- Yes, roughly, from a parking

3    spaced.

4    Q.    Okay.

5    A.    They were probably another 12-to-15

6    feet away from my back.

7    Q.    Now, you showed Mr. Moore the, the

8    parking sign.  Did you point that out to Mr. Moore?

9    A.    Yes.

10    Q.    The reserved only --

11    A.    On, on several diffrent occasions.

12    Q.    And what did Mr. Moore respond?  How

13    did he respond in reference to the parking sign, if

14    you recall?

15    A.    Normally, his response is, "Do what

16    you got to do," and he goes in the bank.  He goes --

17    He just on about his business and that's that.  This

18    particular day, he chose to stay out in the parking

19    lot and have a confrontation with me.

20    Q.    Okay.  Let me go back a minute.  You

21    said, "normally."  So he's been at that parking space

22    before?  You've observed him --

23    A.    Right.

24    Q.    -- parking in that space before?

25    A.    You asked me earlier have I ever had

51

```
 1   contact with him and I told you just on this, this
 2   situation --
 3              Q.   Okay.
 4              A.   -- with the parking space.
 5              Q.   On the other days, though --
 6              A.   Correct.
 7              Q.   -- prior to June 21st?
 8              A.   Correct.
 9              Q.   And you've told him on other occasions
10   not to park in this reserved, only, parking space?
11              A.   I've asked.
12              Q.   Or you've asked him, move your
13   vehicle?
14              A.   Correct.
15              Q.   Which he has never done; is that your
16   testimony?
17              A.   Correct.
18              Q.   And in response to that, have you had
19   occasion to do anything on prior occasions?
20              A.   No.
21              Q.   Have you ever went and got a store
22   manager on prior occasions about Mr. Moore's vehicle
23   being in the reserved only, "Reserved for Police
24   Vehicles Only," space?
25              A.   No.
```

52

```
 1              Q.    So, normally, he would just continue
 2   on, go to the bank, get back in the vehicle and drive
 3   off?
 4              A.    Right.
 5              Q.    On previous, previous occasions?
 6              A.    Correct.
 7              Q.    But you say on this particular time,
 8   he remained outside and engaged in a conversation
 9   with you?
10              A.    Engaged in a confrontation with me;
11   yes.
12              Q.    Okay.  Now, confrontation, why was it
13   confrontational?  Why was he confrontational?
14              A.    Because he was argumentative over the
15   parking spot and what was goin' on with the current
16   news with the Police Department and his, his actions
17   became to a point where it involved -- it started to
18   get everybody else involved in it.
19              Q.    Okay.  His actions or his -- When you
20   say his, "actions," body language or verbal language?
21              A.    Body actions, some verbal, some hand
22   gestures, movement, just actions period.
23              Q.    Okay.  Now, he's argumentative; your
24   conversation was totally about the parking space; is
25   that correct?
```

53

```
 1              A.   Initially, yes.
 2              Q.   Okay.  Initially, then what did it
 3    change to?
 4              A.   His behavior.
 5              Q.   Did you engage in any type of
 6    conversation with him in reference to his other
 7    comments about the Police Department, the Justice
 8    Department, what's goin' on here in the city?
 9              A.   No.
10              Q.   At what point did your conversation
11    turn to Mr. Moore's behavior?
12              A.   I guess the -- What started to make me
13    become more aware of the situation is when the first
14    outburst came from behind me.  The other people
15    started to get involved.
16              Q.   Okay.  So once other people started to
17    get involved, you then --
18              A.   Called for backup.
19              Q.   Called for backup.  And are you saying
20    that other people were becoming involved because of
21    Mr. Moore's actions?
22              A.   Just -- I guess I would say just
23    because of there was some activity goin' on between
24    the police and another person, period.
25              Q.   That would cause the crowd to get
```

54

1   involved?

2          A.   Right.

3          Q.   So it wasn't Mr. Moore's, it wasn't

4   Mr. Moore's actions, specifically, that was causing

5   the crowd to get involved?  It could have been the

6   fact that you and Mr. Moore, a Police Officer and

7   another individual --

8          A.   His, his actions caused 'em to get

9   involved.

10          Q.   Hold on one second.  Let me finish the

11   question.  Because you and Mr. Moore, you as a police

12   officer, him as another person were engaged in, in a

13   conversation.

14               MR. HARRIS:  Objection, asked and

15          answered, but you can answer if you know.

16          A.   His actions caused people to get

17   involved.  Why they choose to get involved is my

18   reason of saying that just because the police is out

19   having whatever dealings with a citizen.

20          Q.   Okay, okay, I understand what you're

21   saying.

22               So you then, I believe, said you

23   decided to call for backup; correct?

24          A.   That's correct.

25          Q.   And what, exactly, did you state to

55

```
 1    the dispatcher?

 2              A.    I can't remember.  I think the car,

 3    the detail number is 5976, "Can you start me another

 4    car towards Krogers?"

 5              Q.    No other details as to --

 6              A.    She'll say, "What do you have there,"

 7    disorderly subject.

 8              Q.    Okay.  And that's what you stated?

 9              A.    Correct.

10              Q.    Now, another police officer eventually

11    arrived; correct?

12              A.    Correct.

13              Q.    And would that have been Police

14    Officer Schulte?

15              A.    Yes, he was one of 'em.

16              Q.    And who were the other ones, if any?

17              A.    His partner was Officer Joehonny Reese

18    and Lt. Bley also arrived.

19              Q.    Now, Officer Schulte and Officer Reese

20    were in one vehicle?

21              A.    Yes.

22              Q.    And Lt. Bley was in a separate

23    vehicle?

24              A.    Correct.

25              Q.    So they pulled up to the parking lot.
```

58

```
 1              A.    I can't recall the exact words about
 2    it.
 3              Q.    At any time, did you tell him that he
 4    couldn't enter inside of the Kroger Store?
 5              A.    No, I did not.
 6              Q.    At any time, after you dispatched, did
 7    you try to prevent him, manually, with your hands or
 8    verbally, from going inside of the Kroger Store?
 9              A.    At that time, he was gonna be under
10    arrest for disorderly conduct, so he couldn't go into
11    the store after I called for backup.
12              Q.    Did you communicate that to him?
13              A.    Yes.
14              Q.    I'm sorry?
15              A.    To him?
16              Q.    Yes.
17              A.    Yes.
18              Q.    So you communicated that he would be
19    under arrest for disorderly conduct prior to the
20    dispatch or immediately after the dispatch?
21              A.    Immediately after.
22              Q.    Okay.  And did you then tell him
23    remain here or give him any other commands at that
24    point?
25              A.    I can't remember the exact command or
```

60

```
 1              Q.   Yes, I'm sorry.

 2              A.   Both of 'em.

 3              Q.   And what are you telling them at this

 4    point --

 5              A.   That I --

 6              Q.   -- briefing them on the situation?

 7              A.   Right, exactly.

 8              Q.   I'm sorry.  Did you alert them about

 9    the situation with the parking lot, Mr. Moore

10    refusing or was your conversation strictly about --

11              A.   It was strictly about the behavior and

12    why he was --

13              Q.   His conduct?

14              A.   Right.

15              Q.   I'm sorry.  I wasn't finished with my

16    question.  So your answer is?

17              A.   That I told Schulte that he would be

18    arrested for disorderly conduct; yes.

19              Q.   And at that point, what happened next,

20    after you gave the information to Officer Schulte?

21              A.   He was placed in custody and put

22    inside -- the back of the police car.

23              Q.   So you didn't read him any rights?

24              A.   At that time, I didn't; no.

25              Q.   Did Officer Schulte, to your
```

63

```
 1              Q.    Did you tell Mr. Moore that he was in
 2   violation of the law for parking his vehicle in this
 3   space?
 4              A.    No.   Are you talking about for his
 5   arrest?
 6              Q.    No, I'm sorry; with respect to the
 7   parking, with him parking his vehicle in the
 8   reserved-for-police-vehicles-only space?
 9              A.    No, I didn't tell him he was in
10   violation of the law.
11              Q.    Okay.
12              A.    It was a violation of Kroger law, not
13   police law.
14              Q.    And I'm not sure if I asked this
15   already, but did you ask anyone from Krogers if they
16   wanted to sign a complaint against Mr. Moore for
17   parking in this space?
18              A.    No.
19              Q.    And did you ask Mr. Moore -- I'm
20   sorry.   Did you ask anyone from Krogers if they
21   wanted to have Mr. Moore's vehicle towed from this
22   space?
23              A.    No, I didn't.
24              Q.    Okay.   Now, was there a manager
25   outside, from Krogers, during this incident with Mr.
```

64

1   Moore?

2           A.    I can't recall.

3           Q.    Do you recall speaking to a manager

4   while you were outside?

5           A.    While we were outside?

6           Q.    Um-hum.

7           A.    No.

8           Q.    Now, at any point during this incident

9   with Mr. Moore, did you become upset?

10          A.    No.

11          Q.    Did you ever become agitated in

12  dealing with Mr. Moore?

13          A.    No.

14          Q.    So the fact that Mr. Moore did not

15  want to move his vehicle, that didn't bother you in

16  any way?

17          A.    No, it didn't.  In fact, if he'd just

18  kept walking to the store, this probably would have

19  been the same as any other occasion; that would have

20  been that, but this day, he chose to stand outside and

21  have a confrontation with me.

22          Q.    Okay.  How many times, roughly, would

23  you say that you've asked Mr. Moore to move his

24  vehicle?

25          A.    Two, three, tops.

67

```
 1              A.   No.

 2              Q.   And were there customers and patrons

 3    still coming in and out of Krogers during this time?

 4              A.   Yes.

 5              Q.   How long, if you recall was Police

 6    Officer Schulte at the scene, say from the time he

 7    arrived to the time he transported Mr. Moore to the

 8    Justice Center?

 9              A.   I can remember how long.

10              Q.   More than 15 minutes?

11              A.   It's possible.  I can't remember.

12              Q.   And what about once Mr. Moore is

13    handcuffed, is he still making the same statements as

14    he was making previously?

15              A.   Well, once he's handcuffed, he's inside

16    the car, so at that time, the situation that I was

17    trying to de-escalate, it was over.  So whatever he

18    had to say inside the car, I didn't pay it no mind.

19              Q.   Now, just to make sure I have this

20    clear, Mr. Moore was arrested for disorderly conduct?

21              A.   Correct.

22              Q.   And is it your testimony, officer,

23    that his behavior and -- Well, I'm sorry; you said,

24    "his actions," you said he had a raised voice; is

25    that correct?
```

77

1  officer.

2          Q.    You arrested the Plaintiff in your

3  capacity as a Cincinnati Police Officer?

4          A.    That is correct.

5          Q.    You didn't arrest him as an employee

6  or security guard for Kroger?

7          A.    That's correct.

8          Q.    And no Kroger personnel or employee

9  suggested or told you or asked you to arrest the

10  Plaintiff on that day?

11          A.    No, they didn't.

12          Q.    You made an independent judgment to

13  arrest Mr. Moore based upon the situation in your

14  training and experience as a Cincinnati Police

15  Officer.

16          A.    That's correct.

17          Q.    Do you know whether you could have

18  cited Mr. Moore for trespassing since he parked in a

19  reserved spot on this private lot?

20          A.    Cite him for trespassing?

21          Q.    Yes.

22          A.    No.    That's up to the store to bar him

23  from the store and at that point, he can be

24  trespassing.

25          MR. HILLER:    I don't have any other