1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF OHIO

3               WESTERN DIVISION

4

5    ANTONIO MOORE,

6          Plaintiff,

7                    CASE NO. C-1-02-0430

8    KROGER COMPANY, et al.,        :

9          Defendants.        :

10          - - -

11          The Deposition of ANTONIO

12    PRENTIS MOORE taken by the defendants as

13    upon cross-examination, pursuant to the

14    Ohio Rules of Civil Procedure and pursuant

15    to agreement by counsel as to the time and

16    place and stipulations hereinafter set

17    forth, at the offices of Schroeder,

18    Maundrell, Barbiere & Powers, 11935 Mason

19    Road, Suite 100, Cincinnati, Ohio, at

20    10:00 a.m. on Wednesday, the 2nd day of

21    April, 2003, before Margaret M. Lynch,

22    Registered Professional Reporter, a Notary

23    Public within and for the State of Ohio.

24

25

16

1      A.   The Kroger's at Kinnard off of

2   Mitchell Avenue.

3      Q.   And how long would you say you did

4   your banking at Fifth Third at this

5   particular branch leading up to June 21st

6   of 2001?

7      A.   I really don't recall.

8      Q.   Was it a number of years?

9      A.   At least eight years.  I really

10  don't recall.

11     Q.   Did you conduct your banking

12  business there on a regular basis?

13     A.   Define regular, please.

14     Q.   Well, like every Thursday or once a

15  week or every day at such-and-such a time

16  or something like that?

17     A.   Yes.

18     Q.   What sort of regular basis would

19  you conduct your business there?

20     A.   A minimum of two to three times a

21  week.

22     Q.   And when you would go, what would

23  you do, just make a deposit of cash?

24     A.   Yes, cash and checks.

25     Q.   Back in June, what day of the week

20

1    Q.  For clarity, this Kroger employee
2    also includes the police officer.
3    A.  No.
4    Q.  Just people like management at the
5    Kroger store, the check-out people, the
6    cashiers, the people at the service
7    counter, the baggers and people like that,
8    had you had any -- had you had any -- I'm
9    not exactly sure how to define problem.  I
10   guess what I'd ask you is other than with
11   Cincinnati police officers that might have
12   been working a detail at the Kroger, prior
13   to June 21st, 2001, did you have any bad
14   experiences, if you will, at the Kroger
15   store?
16   A.  Nothing unusual, no.
17   Q.  Prior to June 21st, 2001, did you
18   have any reason to believe that any Kroger
19   employee had any ill will or malice
20   towards you?
21   A.  No.
22   Q.  Prior to June 21st, 2001, did you
23   think that you had done anything while at
24   the Kroger store to have prompted any
25   Kroger employee to have any bad feelings

1    as to you?

2        A.   No.

3        Q.   Prior to June 21st, 2001, were you

4    aware of anyone being arrested for parking

5    in this particular spot?  And when I say

6    that, I'm talking about the police car

7    only reserved spot out in front of the

8    store.

9        A.   No.

10       Q.   Based on your recollection, was

11   there anything written on any of the signs

12   around this parking spot that indicated

13   that if someone parked there, they would

14   be towed?

15       A.   No.

16       Q.   Was there anything that indicated

17   anyone that parked there would be

18   arrested?

19       A.   No.

20       Q.   Was there anything in the store or

21   any sign on the store inside or out that

22   would indicate anything of that nature;

23   that is, that if anybody parked their

24   vehicle in those particular two spots -- I

25   guess there were two spots?

22

1    A.   That's what I understand, yes.

2    Q.   That's what the officer said last

3  week.

4    A.   Yes.

5    Q.   That if someone parked in one of

6  those spots, either their car would be

7  towed or they would be arrested?

8    A.   No.

9    Q.   So, it sounds like it would be fair

10  to say that prior to June 21st, 2001, you

11  had no reason to believe any Kroger

12  employee -- and I'm not including

13  Cincinnati police officers that might be

14  working on a detail -- had any ill will or

15  malice towards you?

16    A.   That's correct.

17    Q.   Do you recall with respect to the

18  sign or signs at these two spots that

19  talked about police cars only are to park

20  here, if they said police cars as opposed

21  to Kroger security or Kroger cars?  Do you

22  recall specifically what they said?

23    A.   I don't recall specifically what

24  they said.

25    Q.   Okay.  Do you remember anything

23

1    indicating that the spots were for Kroger

2    security?

3        A.   I do not remember seeing anything

4    that said Kroger security.

5        Q.   I want to talk about Officer McNeil

6    and other uniformed Cincinnati police

7    officers that may have been working on

8    details on times that you visited this

9    store.  Had you had any -- I'll call it

10   dealings with Officer McNeil prior to this

11   day?

12       A.   Could you define dealings, please?

13       Q.   Any times when you and he came in

14   contact, either you said something to him

15   or he said something to you?

16       A.   Yes.

17       Q.   Tell me about before this day what

18   I've called dealings or conversations or

19   comments that either one of you might've

20   made to one another?

21       A.   On at least one previous occasion,

22   he indicated that I could not park my

23   truck in that location.

24       Q.   What kind of truck was this?  Is it

25   a pickup truck?

1  other police officers told you you

2  couldn't park there?

3      A.  At least one.

4      Q.  At least one time?

5      A.  Yes.

6      Q.  And can you describe that police

7  officer?

8      A.  No, I can't.

9      Q.  Was he white or black, or do you

10 recall?

11     A.  I believe it was a white officer.

12 I don't really recall.

13     Q.  And what did that officer tell you?

14     A.  To simply -- this is -- I'm

15 paraphrasing because I don't remember

16 exactly, but this is supposed to be for

17 police cars or police officers, I believe

18 was his word.  I really don't remember,

19 but something to that effect.

20     Q.  And did you respond?

21     A.  No, I didn't.

22     Q.  When Officer McNeil told you on one

23 prior occasion that you were not supposed

24 to park there, what was his demeanor, if

25 you will?

27

1      A.   Relaxed.

2      Q.   Relaxed.  Just matter-of-factly,

3  you're just not supposed to park here,

4  that sort of thing?

5      A.   Yes.

6      Q.   You said okay basically and got in

7  your truck and left --

8      A.   Yes.

9      Q.   -- on that occasion?  Did you have

10 any belief or feeling that -- strike

11 that.  Other than your personal

12 observations and dealings with Officer

13 McNeil, do you have any information from

14 any other sources about him; that is,

15 people that you know or friends that you

16 have or anyone else that has had any

17 dealings with him?  Have you spoken to

18 anybody about Officer McNeil?

19     A.   No.

20     Q.   If my memory is correct, Officer

21 McNeil also graduated from Western Hills,

22 did he say?

23     A.   I don't recall.

24     Q.   But you didn't know him from

25 school?

40

1  start to count the money and stop or

2  anything like that?

3     A.  No.

4     Q.  Did you notice any Kroger employees

5  outside the store in this area at the time

6  you got out of your truck and Officer

7  McNeil made this first comment to move the

8  truck?

9     A.  No.

10     Q.  And when you said, "Officer, I need

11  to make a deposit," you may or may not

12  understand what I mean, but did you say it

13  with any sort of attitude or sarcastically

14  or in any way, or did you matter-of-factly

15  make the statement?

16     A.  As I would in a normal tone of

17  voice, I made the statement.

18     Q.  And then what response did he have

19  to that?

20     A.  He said, "Move the truck, or go to

21  jail."

22     Q.  And what was your response?

23     A.  "I'm just going in for a minute if

24  you have to give me a ticket or tow it,

25  but I need to make the deposit."

41

1    Q.  And where was he located, and where
2  were you when you made that statement?
3    A.  He was closer to me and the truck.
4    Q.  Where were you in relation to your
5  truck at that point?
6    A.  Near the parking spot, near the
7  sign in the parking lot.
8    Q.  To speak with you from where he was
9  located on the sidewalk in front of the
10  store, would he have to yell?
11    A.  No.  He approached me as I exited
12  the truck.
13    Q.  Okay.  And so, when you had this
14  conversation where he said, "Move the
15  truck," and you said, "Officer, I need to
16  make a deposit," and he said, "Move the
17  truck or go to jail," and you said, "If
18  you have to give me a ticket or tow it,
19  okay, but I need to make a deposit," where
20  were you two located then?  You were by
21  your truck still?
22    A.  We were closer to the center of the
23  little street -- little traffic thruway
24  there.
25    Q.  Were you out in where cars drive?

42

1    A.  At this point, we were -- as I

2    exited, again, he's -- he started to

3    approach me.  And when I got out of the

4    truck, I was walking directly into

5    Kroger's, towards Kroger's.  I didn't make

6    it to even the sidewalk when we were

7    talking.

8    Q.  So, both of you were off the

9    sidewalk?

10    A.  Yes.

11    Q.  The street in front of the sidewalk

12    there?

13    A.  Approximately the fire lane at that

14    point.

15    Q.  Do you have any information that

16    Kroger directed Officer McNeil to make the

17    statement that you said he made, which is,

18    "Move the truck or go to jail"?

19    A.  Do I have any?

20    Q.  Do you have any information that

21    Kroger directed him to make a comment --

22    A.  No.

23    Q.  -- a statement like that?  All

24    right.  So after you said, "I really need

25    to make this deposit.  Either give me a

43

1    ticket or tow it," what happened then?

2    What did he say?

3        A.   He said, "Move it or --" it was the

4    same conversation.  And I repeated, "If

5    you need to, Officer, please tow it or

6    give me a ticket."

7        Q.   And what did he say after that?

8        A.   He said, "You're going to jail."

9        Q.   How long did this conversation last

10   from the first time he said, "Move the

11   truck," until he said, "You're going to

12   jail"?

13       A.   No longer than three minutes.

14       Q.   Do you know of any witnesses to

15   this conversation other than the two of

16   you?

17       A.   Yes.

18       Q.   Who?

19       A.   Abdul Berry.

20       Q.   Is this someone you knew before

21   that day?

22       A.   No.

23       Q.   Where was he located when you were

24   having this conversation with Officer

25   McNeil?

46

1    Q.   Did you ever raise your voice

2  during the conversation you had with him?

3    A.   No.

4    Q.   Now, you said that the officer

5  said, "You're under arrest"?  Is that what

6  you said he said?

7    A.   He said, "You're going to jail."

8    Q.   And did you have a comment to him

9  after that?  Did you say anything to him

10  after that?

11    A.   No.

12    Q.   And what, if anything, did he do at

13  that point after he said, "You're going to

14  jail"?

15    A.   He called on his radio.

16    Q.   On his personal radio on his

17  shoulder there?

18    A.   Yes.

19    Q.   Did you hear what he said?

20    A.   No.

21    Q.   Did he put you in cuffs?

22    A.   No.

23    Q.   Did he hold on to you?

24    A.   No.

25    Q.   You never walked into the store

47

1    that day?

2        A.   No.

3        Q.   Other police cars arrived?

4        A.   Yes.

5        Q.   I know I'm jumping back a little

6    bit here.  Were both of these police spots

7    open?

8        A.   Yes.

9        Q.   Where did the other -- were there

10   two police cars that arrived after he

11   said, "You're going to jail," or you tell

12   me?

13       A.   There was one police car.

14       Q.   Okay.  And where did it park?

15       A.   Approximately right in front of the

16   door, Kroger's door, in the fire lane.

17       Q.   And who was in that vehicle, do you

18   know?

19       A.   Officer Schulte, and I don't

20   remember the other officer's name.

21       Q.   Officer Schulte is white?

22       A.   That's correct.

23       Q.   The other officer is what race?

24       A.   He's African-American.

25       Q.   Now, there was a lieutenant that

48

1   was involved, Bly?

2       A.  Yes.

3       Q.  Did he come to the store while you

4   were there before you were taken away?

5       A.  Yes.  I requested the officers

6   contact their supervisor.

7       Q.  Before we get to the supervisor

8   then, what happened when Officer Schulte

9   and the other officer arrived?

10      A.  They asked me to move the truck.

11      Q.  And what did you say?

12      A.  "If you could, give me a ticket or

13  tow it."

14      Q.  What time would you say they

15  arrived?

16      A.  It was probably five after eight or

17  so.

18      Q.  Was your impression that if you

19  moved the truck, you would not be arrested

20  and not be given a ticket or what?

21      A.  That's what they said, if I moved

22  the truck -- when I was in the back of the

23  police car, they said, "Just move the

24  truck, and we won't have to do this."

25      Q.  Who said that?

50

1    truck."

2        Q.   And what was your response to that?

3        A.   I told him that, again, if he

4    needed to, to give me the ticket or tow

5    it.

6        Q.   Anything else that you said to him?

7        A.   I don't recall anything else.

8        Q.   But when Officer Schulte arrived,

9    your impression was that the bank was

10   probably closed?

11       A.   Yes.

12       Q.   And you wouldn't be able to make a

13   deposit at that point that night?

14       A.   Yes.

15       Q.   Have you ever made for your

16   business a night deposit into a night

17   deposit box?

18       A.   No, never.

19       Q.   At the point when Officer Schulte

20   arrived, why didn't you move your truck or

21   just go home in your truck?

22       A.   Because Officer McNeil said that I

23   was being arrested.

24       Q.   All right.  Well, was your

25   impression when Schulte said, "Move the

55

1    Q.   When Schulte asked you to move the

2  truck, was there anybody preventing you

3  from moving the truck?

4    A.   No.

5    Q.   Did the other police officer ask

6  you to move the truck?

7    A.   Lieutenant Bly?

8    Q.   No, the other police officer we're

9  not sure of the name?

10   A.   I don't recall.

11   Q.   Do you remember any conversation

12  you had with him during the course of the

13  evening?

14   A.   I don't remember.  I think he was

15  pretty quiet.

16   Q.   So, when Schulte put on the cuffs,

17  were you injured in any way as he was

18  putting on the handcuffs?

19   A.   Not during the arrest, no.

20   Q.   You weren't resisting or anything

21  like that?

22   A.   No.

23   Q.   You weren't put against the wall or

24  on the ground or anything like that?

25   A.   No.

56

1    Q.   Did they cuff you behind your back?

2    A.   Yes.

3    Q.   And they put you in which vehicle?

4    A.   Schulte's vehicle.

5    Q.   In the backseat?

6    A.   Yes.

7    Q.   And you asked -- was it Schulte to

8    have his supervisor come to the store?

9    A.   I believe that I did request that

10   after Schulte arrived.

11   Q.   After Schulte arrived, did you have

12   any other conversations with McNeil?

13   A.   No.

14   Q.   And as I understand it, you don't

15   have any recollection of hearing any

16   conversation that McNeil had with Schulte

17   or the other officer or Lieutenant Bly?

18   A.   No.   When Lieutenant Bly arrived, I

19   was in the back of Schulte's vehicle.

20   Q.   You were already cuffed and in the

21   vehicle when Bly arrived?

22   A.   Yes.   That's correct.

23   Q.   And Bly came up to the cruiser to

24   speak with you?

25   A.   That's correct.

57

1    Q.   Was the window open?

2    A.   If it wasn't, they rolled it down.

3    Q.   And what did Lieutenant Bly say to

4    you?

5    A.   "Just move the truck, and this will

6    all go away."

7    Q.   And what was your response to that?

8    A.   I said, "I'm already arrested and

9    in the back of a vehicle, in an officer's

10   vehicle."

11   Q.   Did you say anything else?

12   A.   No.

13   Q.   Why did you not move the truck when

14   Lieutenant Bly said that, "If you move the

15   truck, all of this will go away"?

16   A.   I didn't understand why I was in

17   the car.

18   Q.   Would it be fair to say that you

19   understood from his statement that if you

20   moved your truck that you would not be

21   continued to be arrested; that is, you

22   would be taken out of the cruiser and the

23   cuffs would be taken off; you would move

24   your truck, and you were free to go?  Was

25   that your understanding of Lieutenant

58

1    BLY's statement?

2      A.  I understood him to say that if I

3    moved the truck, then all of this would go

4    away.

5      Q.  And I guess I'm taking it one step

6    further.  By him saying, "This will all go

7    away," did that mean to you -- did you

8    understand that you would be taken out of

9    the cruiser, the cuffs would be taken off,

10   and you were free to go home if that's

11   where you wanted to go?

12     A.  But that's not what he told me.

13     Q.  Well, what was your understanding

14   of what he meant by, "This will all go

15   away"?

16     A.  I didn't take it any way.

17     Q.  You didn't?

18     A.  No.

19     Q.  It didn't occur to you that that

20   meant you would be free to go without

21   being processed or arrested?

22     A.  It may have been, but I don't

23   understand, again, why I was in the

24   cruiser for parking in that spot.

25     Q.  If you understood -- if you had

59

1  understood from Lieutenant Bly by his

2  statement, "Just move the truck, and this

3  will go away," that that meant that you

4  would be taken out of the cruiser, cuffs

5  would be taken off, and you were free to

6  leave to go home or wherever you wanted,

7  would you have done that?

8      A.   No.

9      Q.   Why not?

10     A.   Because I don't believe that the --

11 what I had been subject to at that point

12 was legal.

13     Q.   And what were you going to do about

14 it?  What decision did you make to do

15 about it at that point?  Did you make a

16 decision?

17     A.   No.

18     Q.   So, you wanted the arrest to

19 continue?

20     A.   Well, in that they had already

21 arrested me, that there had been the

22 public humiliation of me being there in

23 handcuffs in front of the Kroger's, then I

24 felt that at that point that process had

25 gone much further than it should have.

60

1  Q. And what did you intend to do about

2 that because of the process going further

3 than it should have?

4  A. Following normal procedures where

5 you think you've been wronged, I was going

6 to contact an attorney.

7  Q. Didn't you think that you could

8 contact an attorney from your home that

9 night or the next day without having to go

10 to the police station?

11  A. To say that I had been falsely

12 arrested?

13  Q. Right.

14  A. Not if I weren't arrested.

15  Q. Okay. I thought you said in your

16 understanding, you were already arrested?

17  A. That is correct. But if I

18 understood your question that if I were at

19 home, I wouldn't be arrested.

20  Q. Okay. So, you wanted them to take

21 you down and process you, take you down to

22 the station?

23  A. If they had arrested me, I felt

24 that was the right thing to do.

25  Q. It was the right thing for you to