```
 1            UNITED STATED DISTRICT COURT OF OHIO
                       WESTERN DIVISION
 2                        - - -

 3

 4   ANTONIO MOORE,               :

 5        PLAINTIFF,              :

 6   VS.                          :   CASE NO. C-1-02-430

 7   CITY OF CINCINNATI, ET AL,:      (JUDGE WEBER)

 8        DEFENDANTS.             :

 9                        - - -

10

11

12            Deposition of POLICE OFFICER MICHAEL

13   PAUL SCHULTE, a witness herein, taken by the

14   plaintiff, as upon cross-examination, pursuant to the

15   Ohio Rules of Civil Procedure and pursuant to

16   agreement between counsel as to the time and place and

17   stipulations hereinafter set forth, at the office of

18   Manley Burk, Court Street, Cincinnati, Ohio 45202 on

19   May 13, 2003 at 10:00 a.m., before Terence M. Holmes,

20   a notary public within and for the State of Ohio.

21

22                        - - -

23
                    HAWKINS COURT REPORTING
24                   1160 Innercircle Drive
                     Cincinnati, Ohio 45240
25              Tele./Fax:  (513) 851-2313
```

22

```
 1         Q.   Okay.  After you got the facts from
 2   Officer McNeil, what were you going to do to help
 3   Officer McNeil out?
 4         A.   I was just going to help, you know,
 5   calm the situation down and, you know, do whatever I
 6   could do to help, you know, there was no, I mean he
 7   didn't say this is exactly what I want you to do.
 8         Q.   Okay.  At that point did Officer McNeil
 9   tell you I want this guy arrested, transport him to
10   jail?
11         A.   Well, I told Officer McNeil, I said,
12   you know, if he's acting like that, if that's what
13   he's doing, you know, you can charge him with
14   disorderly conduct, I mean, you know, if there's all
15   these people around, he's using vulgar language, you
16   know, he's causing a crowed to gather, so, you know, I
17   went, like I said, I went and talked with Mr. Moore, I
18   told him, I asked him what was going on, you know.  He
19   pretty much told me the same thing, you know, he said
20   that the police were corrupt and that he was going to
21   make the City pay for, because the Cincinnati Police
22   Officers feel like they can do anything they want, and
23   I told him I said, well, you know, if you don't calm
24   down, you know, you're going to get arrested, and he
25   told me, he said, well, hey, fuck you then take me to
```

```
 1  jail.
 2          Q.   Okay.  Now, once you started talking to
 3  Mr. Moore, initially he's just standing there with his
 4  arms folded against the pillar?
 5          A.   He may have unfolded his arms when I
 6  talked to him, yeah, but my initial, when I initially
 7  saw him he was, he was standing against the wall,
 8  yeah.
 9          Q.   Okay.  And when you said to him, I
10  believe you said if you don't calm down you're going
11  to get arrested, what was he doing at that point?
12          A.   Well, like I said at that point I don't
13  know if he was still, you know, he obviously wasn't
14  irate at that point anymore, but according to Officer
15  McNeil, you know, his actions were already, you know,
16  out of hand, so I was just like, you know, if you
17  don't just calm down, do what you got to do, you know,
18  just move your truck, I mean the signs are there, you
19  know, and you can be about your way, take care of your
20  business.
21          Q.   Okay.  Now, you were telling him to
22  calm down, did he become belligerent with you or?
23          A.   Well, yeah, like I said, when I told
24  him that and he said -- He either, he either said fuck
25  you or fuck it, one or the two, you know, like -- When
```

26

1  felt were probably going to be a little more
2  important.
3        Q.    Okay.  So if Mr. Moore would have then
4  moved his vehicle he could have just driven off?
5        A.    He didn't have to leave, he can go
6  into Kroger's, that's not up to me.  Like I said, we
7  were there because of Officer McNeil and I was trying
8  to quell the situation.  Obviously there's a sign
9  there that says you can't park there, you know.
10 We're not going to tow his car, at least I wasn't
11 going to tow his car, but he's in violation of a
12 sign, you know, and -- You know his conduct is, you
13 know, not acceptable, I'm just like, you know, why
14 don't you just help us out here a little bit, move
15 your truck calm down, go do what you got to do and go
16 home.
17       Q.    Okay.  Did you talk to anyone from
18 Kroger's about maybe towing the vehicle?
19       A.    I personally did not, no, and I do not
20 know if Marcus would have.
21       Q.    Okay.  Do you know if there was anyone
22 from Kroger's out there or talking in the vicinity?
23       A.    I don't know, I don't remember if there
24 were any Kroger employees out there.
25       Q.    Okay.  But you personally did not have

33

```
 1         A.   Well, I was going to try to answer your
 2   question.
 3         Q.   Okay.  Yeah, go ahead.
 4         A.   You know, once, once he was, when I
 5   talked to McNeil originally, I mean, I don't -- I
 6   would imagine that Officer McNeil could have, based on
 7   what he told me he could have arrested Mr. Moore for
 8   that charge.  Then once I spoke with him and he was
 9   placed under arrest -- Like I said I don't remember
10   if there was any, you know, if we got other and
11   huddled up or anything, I don't know what you're
12   getting at, you know, I mean the charge is what it
13   is, you know, there's nothing that we would have had
14   to add to make it stick or anything like that, I mean
15   I just wrote down what happened.
16         Q.   Okay.  And that's what I was asking,
17   I'm just trying to see when it was determined that he
18   would be charged with disorderly conduct, was that
19   something McNeil told you when you arrived or just
20   from your own observations and what McNeil had
21   described as his behavior, you just said, okay, this
22   is disorderly?
23         A.   Well, yeah, like I said, when I
24   originally talked to Marcus I mean that would have
25   really been the only charge that you could have
```

34

1  charged him with, you know based on his conduct, so I
2  think we were all -- I mean you don't really have to
3  say it, but you all kind of, you're on, everybody is
4  on the same page, I mean you know what's going on,
5  police officers is what I was talking about, you know.
6         Q.   Okay.
7         A.   I mean we didn't actually -- Like I
8  said I don't remember if we, you know, got together
9  and we were like, you know, this is what we're going
10 to do, this is how we're going to do it, I don't think
11 that happened, I don't remember.
12        Q.   Okay.  So who actually filed the
13 complaint against Mr. Moore?
14        A.   I signed the complaint, we were the
15 transporting officers.  I would imagine, I guess
16 Marcus if he would have wanted to, he could have came
17 to the Justice Center and signed the complaint.  It's
18 easier, it was easier for us to go down.  Like I said
19 he had some disorderly behavior with me, also, so it
20 was just as easy for me to sign the complaint.
21             (Complaint, marked for identification as
                Plaintiff's Exhibit 2.)
22        Q.   Okay.  Let me show you what has been
23 previously marked as Plaintiff's Exhibit 2.  Do you
24 recognize that document, Officer?
25        A.   Yes, this is the complaint that I

50

1  intentions were.
2          Q.   Okay.  Was it your perception that
3  Officer McNeil was of that same mind set?
4          A.   Oh, yeah, yeah.
5          Q.   The sign wasn't at issue when you made
6  the arrest, is that correct?
7          A.   No.  If the sign would have been at
8  issue, if I would have been trying to enforce the
9  sign, I would have just towed his truck.
10         Q.   It was actually, it was actually Mr.
11 Moore's behavior that was at issue, correct?
12         A.   Yes.
13         Q.   That's yes?
14         A.   Yes.
15         Q.   And no one from Kroger's directed you
16 to do anything with respect to Mr. Moore on this day?
17         A.   No.
18              D: That's all the questions I have.
19              MR. HARRIS: Just a few questions.
20                  DIRECT EXAMINATION
21 BY MR. HARRIS:
22         Q.   Officer, did you have concerns about
23 the crowed, you may have asked that, concerns about
24 the crowed that you saw when you arrived?
25         A.   Well, like I said, obviously when you