DEPOSITION
OF
ANTONIO PRENTIS MOORE

26

1    other police officers told you you

2    couldn't park there?

3        A.   At least one.

4        Q.   At least one time?

5        A.   Yes.

6        Q.   And can you describe that police

7    officer?

8        A.   No, I can't.

9        Q.   Was he white or black, or do you

10   recall?

11       A.   I believe it was a white officer.

12   I don't really recall.

13       Q.   And what did that officer tell you?

14       A.   To simply -- this is -- I'm

15   paraphrasing because I don't remember

16   exactly, but this is supposed to be for

17   police cars or police officers, I believe

18   was his word.  I really don't remember,

19   but something to that effect.

20       Q.   And did you respond?

21       A.   No, I didn't.

22       Q.   When Officer McNeil told you on one

23   prior occasion that you were not supposed

24   to park there, what was his demeanor, if

25   you will?

40

1    start to count the money and stop or

2    anything like that?

3        A.  No.

4        Q.  Did you notice any Kroger employees

5    outside the store in this area at the time

6    you got out of your truck and Officer

7    McNeil made this first comment to move the

8    truck?

9        A.  No.

10       Q.  And when you said, "Officer, I need

11   to make a deposit," you may or may not

12   understand what I mean, but did you say it

13   with any sort of attitude or sarcastically

14   or in any way, or did you matter-of-factly

15   make the statement?

16       A.  As I would in a normal tone of

17   voice, I made the statement.

18       Q.  And then what response did he have

19   to that?

20       A.  He said, "Move the truck, or go to

21   jail."

22       Q.  And what was your response?

23       A.  "I'm just going in for a minute if

24   you have to give me a ticket or tow it,

25   but I need to make the deposit."

41

1    Q.  And where was he located, and where
2    were you when you made that statement?
3    A.  He was closer to me and the truck.
4    Q.  Where were you in relation to your
5    truck at that point?
6    A.  Near the parking spot, near the
7    sign in the parking lot.
8    Q.  To speak with you from where he was
9    located on the sidewalk in front of the
10   store, would he have to yell?
11   A.  No.  He approached me as I exited
12   the truck.
13   Q.  Okay.  And so, when you had this
14   conversation where he said, "Move the
15   truck," and you said, "Officer, I need to
16   make a deposit," and he said, "Move the
17   truck or go to jail," and you said, "If
18   you have to give me a ticket or tow it,
19   okay, but I need to make a deposit," where
20   were you two located then?  You were by
21   your truck still?
22   A.  We were closer to the center of the
23   little street -- little traffic thruway
24   there.
25   Q.  Were you out in where cars drive?

42

1      A.  At this point, we were -- as I

2   exited, again, he's -- he started to

3   approach me.  And when I got out of the

4   truck, I was walking directly into

5   Kroger's, towards Kroger's.  I didn't make

6   it to even the sidewalk when we were

7   talking.

8      Q.  So, both of you were off the

9   sidewalk?

10     A.  Yes.

11     Q.  The street in front of the sidewalk

12  there?

13     A.  Approximately the fire lane at that

14  point.

15     Q.  Do you have any information that

16  Kroger directed Officer McNeil to make the

17  statement that you said he made, which is,

18  "Move the truck or go to jail"?

19     A.  Do I have any?

20     Q.  Do you have any information that

21  Kroger directed him to make a comment --

22     A.  No.

23     Q.  -- a statement like that?  All

24  right.  So after you said, "I really need

25  to make this deposit.  Either give me a

52

1    the officer had stopped me period and the

2    fact that he had called the additional car

3    for me to be transported is that I was

4    under arrest.

5        Q.   You hadn't been put in handcuffs

6    yet?

7        A.   When Officer Schulte got there, I

8    was put in handcuffs.

9        Q.   Who put the handcuffs on you?

10       A.   Officer Schulte.

11       Q.   Do you know what handcuffs he used,

12   his own or --

13       A.   I believe they were his own.

14       Q.   And did he ask you to move the

15   truck before he put the handcuffs on?

16       A.   I believe he did.

17       Q.   And are you saying that it was your

18   impression that when Officer Schulte got

19   there and asked you to move the truck that

20   he was going to have you move the truck

21   and then still put you in cuffs and take

22   you down to the station?

23       A.   No.  I'm saying that based on

24   Officer McNeil telling me that I was being

25   arrested --

56

1  Q.  Did they cuff you behind your back?

2  A.  Yes.

3  Q.  And they put you in which vehicle?

4  A.  Schulte's vehicle.

5  Q.  In the backseat?

6  A.  Yes.

7  Q.  And you asked -- was it Schulte to

8  have his supervisor come to the store?

9  A.  I believe that I did request that

10 after Schulte arrived.

11 Q.  After Schulte arrived, did you have

12 any other conversations with McNeil?

13 A.  No.

14 Q.  And as I understand it, you don't

15 have any recollection of hearing any

16 conversation that McNeil had with Schulte

17 or the other officer or Lieutenant Bly?

18 A.  No.  When Lieutenant Bly arrived, I

19 was in the back of Schulte's vehicle.

20 Q.  You were already cuffed and in the

21 vehicle when Bly arrived?

22 A.  Yes.  That's correct.

23 Q.  And Bly came up to the cruiser to

24 speak with you?

25 A.  That's correct.

**DEPOSITION**
**OF**
**POLICE OFFICER MARCUS McNEIL**

43

1          A.    This day?

2          Q.    On June 21st of 2001?

3          A.    Where -- He was parking his truck in

4    the parking space that's on the pictures here.

5          Q.    Okay.  And how far away, roughly, is

6    the parking space from where you were standing?

7          A.    About maybe 50 feet, maybe.

8          Q.    Okay.  And so you saw Mr. Moore pull

9    in and parked, parked his truck in this parking space

10   and that's, again, we're referencing the "Reserved

11   for Police Vehicles Only," space, depicted in

12   Plaintiff's Exhibit 1; correct?

13         A.    Right.

14         Q.    What do you then do as you see Mr.

15   Moore pull into the space?

16         A.    Walk up to him and ask him, you know,

17   just take notice of the sign and that's for police

18   cars only.

19         Q.    And what did he say?

20         A.    I can't remember his exact words.  He

21   became agitated.  He began to talk about the Justice

22   Department and the police is corrupt and -- I can't

23   remember everything that he said, the specific

24   details that he said --

25         Q.    Um-hum, I understand.

```
 1              Q.   So the crowd was about 40 feet away?

 2              A.   Maybe -- Yes, roughly, from a parking

 3    spaced.

 4              Q.   Okay.

 5              A.   They were probably another 12-to-15

 6    feet away from my back.

 7              Q.   Now, you showed Mr. Moore the, the

 8    parking sign.  Did you point that out to Mr. Moore?

 9              A.   Yes.

10              Q.   The reserved only --

11              A.   On, on several diffrent occasions.

12              Q.   And what did Mr. Moore respond?  How

13    did he respond in reference to the parking sign, if

14    you recall?

15              A.   Normally, his response is, "Do what

16    you got to do," and he goes in the bank.  He goes --

17    He just on about his business and that's that.  This

18    particular day, he chose to stay out in the parking

19    lot and have a confrontation with me.

20              Q.   Okay.  Let me go back a minute.  You

21    said, "normally."  So he's been at that parking space

22    before?  You've observed him --

23              A.   Right.

24              Q.   -- parking in that space before?

25              A.   You asked me earlier have I ever had
```

```
 1    contact with him and I told you just on this, this
 2    situation --
 3              Q.    Okay.
 4              A.    -- with the parking space.
 5              Q.    On the other days, though --
 6              A.    Correct.
 7              Q.    -- prior to June 21st?
 8              A.    Correct.
 9              Q.    And you've told him on other occasions
10    not to park in this reserved, only, parking space?
11              A.    I've asked.
12              Q.    Or you've asked him, move your
13    vehicle?
14              A.    Correct.
15              Q.    Which he has never done; is that your
16    testimony?
17              A.    Correct.
18              Q.    And in response to that, have you had
19    occasion to do anything on prior occasions?
20              A.    No.
21              Q.    Have you ever went and got a store
22    manager on prior occasions about Mr. Moore's vehicle
23    being in the reserved only, "Reserved for Police
24    Vehicles Only," space?
25              A.    No.
```

53

```
1              A.   Initially, yes.
2              Q.   Okay.  Initially, then what did it
3   change to?
4              A.   His behavior.
5              Q.   Did you engage in any type of
6   conversation with him in reference to his other
7   comments about the Police Department, the Justice
8   Department, what's goin' on here in the city?
9              A.   No.
10             Q.   At what point did your conversation
11  turn to Mr. Moore's behavior?
12             A.   I guess the -- What started to make me
13  become more aware of the situation is when the first
14  outburst came from behind me.  The other people
15  started to get involved.
16             Q.   Okay.  So once other people started to
17  get involved, you then --
18             A.   Called for backup.
19             Q.   Called for backup.  And are you saying
20  that other people were becoming involved because of
21  Mr. Moore's actions?
22             A.   Just -- I guess I would say just
23  because of there was some activity goin' on between
24  the police and another person, period.
25             Q.   That would cause the crowd to get
```

1  the dispatcher?

2          A.    I can't remember.  I think the car,

3  the detail number is 5976, "Can you start me another

4  car towards Krogers?"

5          Q.    No other details as to --

6          A.    She'll say, "What do you have there,"

7  disorderly subject.

8          Q.    Okay.  And that's what you stated?

9          A.    Correct.

10          Q.    Now, another police officer eventually

11  arrived; correct?

12          A.    Correct.

13          Q.    And would that have been Police

14  Officer Schulte?

15          A.    Yes, he was one of 'em.

16          Q.    And who were the other ones, if any?

17          A.    His partner was Officer Joehonny Reese

18  and Lt. Bley also arrived.

19          Q.    Now, Officer Schulte and Officer Reese

20  were in one vehicle?

21          A.    Yes.

22          Q.    And Lt. Bley was in a separate

23  vehicle?

24          A.    Correct.

25          Q.    So they pulled up to the parking lot.

56

1   Who arrived first?

2           A.    Officer Schulte.

3           Q.    He was the driver?

4           A.    I can't remember if he was driving or

5   he was a passenger.

6           Q.    And how long thereafter did Lt. Bley

7   arrive?

8           A.    I can't remember.

9           Q.    But shortly thereafter?

10          A.    Um-hum.

11          Q.    And where did Officer Schulte and

12  Officer Reese pull their vehicle?

13          A.    I can't remember.

14          Q.    Do you know if they parked it in a

15  space?

16          A.    I can't remember.

17          Q.    What about Lt. Bley, do you know where

18  he pulled his vehicle?

19          A.    I can't remember.

20          Q.    Did they have the headlights flashing

21  on the vehicles?

22          A.    Not that I know.  I can't remember.

23          Q.    Okay.  What about sirens, did they

24  have sirens on the vehicles?

25          A.    No, there wasn't; no.

63

1          Q.   Did you tell Mr. Moore that he was in

2   violation of the law for parking his vehicle in this

3   space?

4          A.   No.  Are you talking about for his

5   arrest?

6          Q.   No, I'm sorry; with respect to the

7   parking, with him parking his vehicle in the

8   reserved-for-police-vehicles-only space?

9          A.   No, I didn't tell him he was in

10  violation of the law.

11         Q.   Okay.

12         A.   It was a violation of Kroger law, not

13  police law.

14         Q.   And I'm not sure if I asked this

15  already, but did you ask anyone from Krogers if they

16  wanted to sign a complaint against Mr. Moore for

17  parking in this space?

18         A.   No.

19         Q.   And did you ask Mr. Moore -- I'm

20  sorry.  Did you ask anyone from Krogers if they

21  wanted to have Mr. Moore's vehicle towed from this

22  space?

23         A.   No, I didn't.

24         Q.   Okay.  Now, was there a manager

25  outside, from Krogers, during this incident with Mr.

64

1    Moore?

2            A.    I can't recall.

3            Q.    Do you recall speaking to a manager

4    while you were outside?

5            A.    While we were outside?

6            Q.    Um-hum.

7            A.    No.

8            Q.    Now, at any point during this incident

9    with Mr. Moore, did you become upset?

10           A.    No.

11           Q.    Did you ever become agitated in

12   dealing with Mr. Moore?

13           A.    No.

14           Q.    So the fact that Mr. Moore did not

15   want to move his vehicle, that didn't bother you in

16   any way?

17           A.    No, it didn't.  In fact, if he'd just

18   kept walking to the store, this probably would have

19   been the same as any other occasion; that would have

20   been that, but this day, he chose to stand outside and

21   have a confrontation with me.

22           Q.    Okay.  How many times, roughly, would

23   you say that you've asked Mr. Moore to move his

24   vehicle?

25           A.    Two, three, tops.

67

1           A.   No.

2           Q.   And were there customers and patrons

3    still coming in and out of Krogers during this time?

4           A.   Yes.

5           Q.   How long, if you recall was Police

6    Officer Schulte at the scene, say from the time he

7    arrived to the time he transported Mr. Moore to the

8    Justice Center?

9           A.   I can remember how long.

10          Q.   More than 15 minutes?

11          A.   It's possible.  I can't remember.

12          Q.   And what about once Mr. Moore is

13   handcuffed, is he still making the same statements as

14   he was making previously?

15          A.   Well, once he's handcuffed, he's inside

16   the car, so at that time, the situation that I was

17   trying to de-escalate, it was over.  So whatever he

18   had to say inside the car, I didn't pay it no mind.

19          Q.   Now, just to make sure I have this

20   clear, Mr. Moore was arrested for disorderly conduct?

21          A.   Correct.

22          Q.   And is it your testimony, officer,

23   that his behavior and -- Well, I'm sorry; you said,

24   "his actions," you said he had a raised voice; is

25   that correct?

DEPOSITION
OF
POLICE OFFICER MICHAEL PAUL SCHULTE

15

1    Kroger's tell you that specifically what those

2    parking spaces were for?

3         A.    Specifically, no, like I never asked.

4         Q.    Okay.  So the information -- Your

5    belief is just based on the fact that that's what the

6    signs say?

7         A.    Yeah, I mean I just read what it said.

8         Q.    Okay.  Just like a self-explanatory

9    police vehicles?

10        A.    Yeah, that's the way I took it anyways.

11        Q.    Okay.  Okay, that's fine.  Okay. Now,

12   let's talk about June 21st.  How did you come to

13   arrive at the Kroger's?

14        A.    We were asked to respond there by the

15   officer who was working the detail.

16        Q.    And that would have been Police Officer

17   McNeil?

18        A.    That's correct.

19        Q.    Okay.  What exactly was communicated to

20   you?

21        A.    I don't remember exactly what he said,

22   he just asked for -- The best I can remember is he

23   just asked for a car to respond to Kroger's, I

24   believe for disorderly subject, something I think.

25        Q.    Okay.  Where were you coming from at

27

```
 1   any discussion --

 2          A.   I personally did not talk to any Kroger

 3   employees, no.

 4          Q.   Okay.  And basically, I just want to

 5   make sure that I have this clear.  You said that his,

 6   that Mr. Moore was, had become disorderly, you were

 7   giving him the alternative to calm down and move the

 8   vehicle --

 9          A.   Yeah.

10          Q.   -- or be arrested?

11          A.   Once, yes.  Once he began cursing at me

12   that was when I made the decision to place Mr. Moore

13   under arrest, like I said.

14          Q.   And you believe that cursing is

15   disorderly conduct?

16          MR. HARRIS:  Objection, asked and

17   answered, but you can answer again.  Excuse me, you

18   can answer it again.

19          A.   Cursing alone, no, I don't believe that

20   is disorderly conduct, but when you carry yourself in

21   a manner that is offensive to other people and when

22   you carry yourself in a manner that presents a risk of

23   harm to somebody such as carrying yourself in a manner

24   that causes a crowed to gather, okay, for one there

25   were myself and two other officers there and we were
```

1  outnumbered, like I said there was maybe 10 people

2  there.  I don't know if they were there just to watch,

3  I didn't know if they knew Mr. Moore, I had no idea,

4  okay.  So to answer your question, cursing alone, no,

5  that is not disorderly conduct.  I think everybody in

6  this room has cursed before, but when you use it

7  doing it in such a manner that it's offensive to

8  people, to children, you know, in a business such as

9  Kroger's and you do it carrying yourself like Mr.

10 Moore did, I believe that is disorderly conduct.

11        Q.   Officer, you would agree with me that

12 often times when there are three police officers

13 present, another individual, a crowed will gather?

14            MR. HARRIS: Objection.  Speculation,

15 you can answer.

16        A.   Sometimes, sometimes when there's one

17 police officer a crowed is going to gather.

18        Q.   Okay.  When did officer, I'm sorry,

19 Lieutenant Bley arrive at the scene?

20        A.   I don't know exactly the time, I

21 believe Mr. Moore was already in our police car when

22 Lieutenant Bley arrived there.

23        Q.   Okay.  And how did he come to arrive

24 at the scene, at Kroger's?

25        A.   To be honest with you I don't know.  I

29

1    don't know if Officer McNeil called him or Officer

2    Reese had called him, I didn't ask for a supervisor to

3    show up.  On something like that, I don't -- I only

4    call for a supervisor if I feel I need some advice or

5    some help or something like that, I don't know -- To

6    be honest with you, like I said I don't know who

7    called him to be there, I think Officer Reese

8    requested a supervisor.

9              Q.    Okay.  But at that point you believe

10   Mr. Moore was in your cruiser?

11             A.    I think, I'm almost positive that he

12   was.

13             Q.    Okay.  Who actually cuffed Mr. Moore?

14             A.    I believe I did.

15             Q.    Did you read him his Miranda rights?

16             A.    I don't know if I did or not, I don't

17   remember.

18             Q.    Okay.

19             A.    I may not have.

20             Q.    Okay.  So he's placed in the back of

21   your cruiser, Lieutenant Bley arrives.  Did you speak

22   with Lieutenant Bley?

23             A.    Briefly.  He just pretty much asked

24   what was going on, told him and, you know, he was

25   like, you know, okay, he asked, you know, are you

33

1          A.    Well, I was going to try to answer your

2    question.

3          Q.    Okay.  Yeah, go ahead.

4          A.    You know, once, once he was, when I

5    talked to McNeil originally, I mean, I don't -- I

6    would imagine that Officer McNeil could have, based on

7    what he told me he could have arrested Mr. Moore for

8    that charge.  Then once I spoke with him and he was

9    placed under arrest -- Like I said I don't remember

10   if there was any, you know, if we got other and

11   huddled up or anything, I don't know what you're

12   getting at, you know, I mean the charge is what it

13   is, you know, there's nothing that we would have had

14   to add to make it stick or anything like that, I mean

15   I just wrote down what happened.

16         Q.    Okay.  And that's what I was asking,

17   I'm just trying to see when it was determined that he

18   would be charged with disorderly conduct, was that

19   something McNeil told you when you arrived or just

20   from your own observations and what McNeil had

21   described as his behavior, you just said, okay, this

22   is disorderly?

23         A.    Well, yeah, like I said, when I

24   originally talked to Marcus I mean that would have

25   really been the only charge that you could have

34

1   charged him with, you know based on his conduct, so I

2   think we were all -- I mean you don't really have to

3   say it, but you all kind of, you're on, everybody is

4   on the same page, I mean you know what's going on,

5   police officers is what I was talking about, you know.

6           Q.   Okay.

7           A.   I mean we didn't actually -- Like I

8   said I don't remember if we, you know, got together

9   and we were like, you know, this is what we're going

10  to do, this is how we're going to do it, I don't think

11  that happened, I don't remember.

12          Q.   Okay.  So who actually filed the

13  complaint against Mr. Moore?

14          A.   I signed the complaint, we were the

15  transporting officers.  I would imagine, I guess

16  Marcus if he would have wanted to, he could have came

17  to the Justice Center and signed the complaint.  It's

18  easier, it was easier for us to go down.  Like I said

19  he had some disorderly behavior with me, also, so it

20  was just as easy for me to sign the complaint.

21              (Complaint, marked for identification as
                Plaintiff's Exhibit 2.)

22          Q.   Okay.  Let me show you what has been

23  previously marked as Plaintiff's Exhibit 2.  Do you

24  recognize that document, Officer?

25          A.   Yes, this is the complaint that I

50

1   intentions were.

2           Q.   Okay.  Was it your perception that

3   Officer McNeil was of that same mind set?

4           A.   Oh, yeah, yeah.

5           Q.   The sign wasn't at issue when you made

6   the arrest, is that correct?

7           A.   No.  If the sign would have been at

8   issue, if I would have been trying to enforce the

9   sign, I would have just towed his truck.

10          Q.   It was actually, it was actually Mr.

11  Moore's behavior that was at issue, correct?

12          A.   Yes.

13          Q.   That's yes?

14          A.   Yes.

15          Q.   And no one from Kroger's directed you

16  to do anything with respect to Mr. Moore on this day?

17          A.   No.

18               D: That's all the questions I have.

19               MR. HARRIS: Just a few questions.

20                   DIRECT EXAMINATION

21  BY MR. HARRIS:

22          Q.   Officer, did you have concerns about

23  the crowed, you may have asked that, concerns about

24  the crowed that you saw when you arrived?

25          A.   Well, like I said, obviously when you

**EXHIBIT**

2917.11(A)  DISORDERLY CONDUCT

PLT'S 2

CASE NO. _____

# COMPLAINT

## HAMILTON COUNTY MUNICIPAL COURT

*ARRESTED* THE DEFENDANT HEREIN WAS PHYSICALLY ARRESTED DATE

STATE OF OHIO vs. ANTONIO MOORE

3740 WASHINGTON AV.

(Address)

CINTI, OH 45229

PO SCHULTE #721 _____, being first duly cautioned and sworn, deposes and says the

ANTONIO MOORE _____ on or about 06/21/02 _____, in Hamilto

(date)

County, and State of Ohio, did recklessly cause * ~~FEAR~~ ANNOYANCE to another by ** ENGAGING IN CONDU

THAT WAS PHYSICALLY OFFENSIVE TO PERSONS & SERVED NO LAWFUL

PURPOSE, _____, contrary to and i

violation of Section 2917.11(A) of the Revised Code of Ohio, a *** M-4

The complainant states that this complaint is based on SUBJECT WAS PARKED IN A POSTED SPOT

RESERVED FOR POLICE OFFICERS DUE TO SUB-STATION. WHEN TOLD TO MOVE NUMEROUS

TIMES, SUBJECT REFUSED CAUSING A GROUP OF PATRONS TO GATHER. SUBJE[CT]

STATED THAT HE WANTED TO PROVE A POINT.

Sworn to and subscribed before me this 6-21-0[ ]

M. Schulte #721

(Complainant)

Notary Public/Deputy Clerk/Judge

Filed   6-24-0[ ]

JAMES CISSELL
Clerk of the Hamilton County Municipal Court

By _____

Deputy Clerk

1012 LUDLOW AV.

(Address)

CINTI OH 45223

INSERT ONE OF THE FOLLOWING:

*"inconvenience", "annoyance" or "alarm"

**"engaging in fighting", "engaging in threatening harm to (persons) (property)", "engaging in (violent) (turbulent) behavior", "maki unreasonable noise", "making an offensively coarse (utterance) (gesture) display)", "communicating unwarranted and grossly abusive la guage to (victim's name)", "(insulting) (taunting) (challenging) (victim's name) under circumstances in which such conduct was likely provoke a violent response", "(hindering) (preventing) the movement of persons on a public (street) (road) (highway) (right-of-way) as to interfere with the rights of others, by an act which served no lawful and reasonable purpose", "(hindering) (preventing) the moveme of persons (to) (from) (within) (upon) public/private property, so as to interfere with the rights of others, by an act which served lawful and reasonable purpose", "creating a condition which was physically offensive to some persons by an act which served no lawful a reasonable purpose" or "creating a condition which presented a risk of physical harm to (persons) (property) by an act which served lawful and reasonable purpose"

***"minor misdemeanor" or "misdemeanor of the 4th degree" if the defendant persisted in disorderly conduct after reasonable warning request to desist